UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:11-CR-00045-R

**UNITED STATES OF AMERICA**                                                               **PLAINTIFF**

**v.**

**CURTIS HAMILTON, et al.**                                                                      **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Curtis Hamilton's Motion to Suppress (DN 122). On March 14, 2012, a suppression hearing was held in Paducah, Kentucky. Larry Fentress, AUSA, appeared on behalf of the Government. Eddie Jones and Rick Walter appeared on behalf of Hamilton. Terri Turner, official court reporter, recorded the proceedings.

At the hearing, the Government introduced testimony from Special Agent Jason Murphy with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Hamilton testified and called four of his employees as witnesses on his behalf. The parties agreed at the hearing that the dispositive issues presented by the motion did not require further briefing. The Court will therefore consider the testimony offered in conjunction with the oral arguments at the hearing's close and make its rulings.

**BACKGROUND**

Defendant Curtis Hamilton is charged with conspiracy to distribute and possess marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). In this motion, Hamilton asserts law enforcement officers violated his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). He alleges that he made incriminating statements to law enforcement when they executed a search warrant on his business, BA's Automotive (herein "Shop") in Paducah, Kentucky, on

May 27, 2011. In the days after the search, Hamilton met with law enforcement officers on two separate occasions to aid in the criminal investigation of Gary Jackson. There, he made more incriminating statements that the Government intends to use against him at trial. He now moves to suppress the statements he made on May 27, 2011, and any incriminating remarks he made during the two subsequent meetings with the police.

The pertinent facts are as follows. On May 25, 2011, postal inspectors in El Paso, Texas, intercepted two suspicious packages that were addressed to "Mike Moore," and destined for 818 South 3rd Street in Paducah. This is the address of the Shop. The return address label indicated that the sender was "Airbags Unlimited Inc." On May 26, 2011, postal inspectors used a drug dog to examine the packages. The dog made a positive alert for the presence of narcotics and a federal search warrant executed on the parcels revealed approximately 24 pounds of marijuana. Law enforcement opted to deliver the two packages to the Shop the following day and arrest the intended recipient.

On the morning of May 27, 2011, law enforcement obtained a search warrant for the Shop from a state-court judge in McCracken County, Kentucky. At 9:30 a.m., the packages were delivered and accepted by an employee at the Shop. Surveillance by law enforcement indicated that the packages were placed in the Shop's reception area and not moved for the rest of the day. At 4:15 p.m., as Hamilton was walking to his car, officers approached him and asked if he was the proprietor. Hamilton acknowledged that he was, and the officers escorted him back into the Shop. At the same time, other officers entered the Shop on the search warrant's authority from doors in the rear and front. The five or six remaining employees scattered throughout the Shop were corralled and placed in the main reception and waiting area ("Center Room"). All the officers were armed but no weapons were drawn on entry or at any time that day.

With Hamilton and all of his employees in the Center Room, the police asked for Mike Moore to step forward. When no one did, the officers asked Hamilton if he had an employee by that name, to which he replied he did not. The officers explained their presence and the delivery of two packages, whereupon Hamilton offered that the packages were intended for Gary Jackson. Hamilton stated that Jackson had informed him earlier in the week the two packages would be arriving with car parts and Jackson was supposed to retrieve them at some point later in the day. Agent Murphy then asked Hamilton if they could continue the conversation in his personal office. Hamilton testified at the hearing that the officers ordered him to go to the other office. In any event, Hamilton obliged and he, Murphy, and another officer relocated to the more private location. The other employees were held in the Shop and asked to relinquish their cell phones for the entirety of the search. None of the employees, including Hamilton, was ever handcuffed or physically restrained.

In his own office, Hamilton told the officers he knew nothing of the packages' contents and indicated he wanted to fully cooperate with the investigation. The officers then asked Hamilton if he would call Jackson and request that he come and retrieve the packages. Hamilton agreed and at approximately 4:30 p.m., he phoned Jackson and told him the packages had arrived and that he needed to come get them. Jackson said that he would, but called sometime later and moved the location of their meeting to a nearby intersection. Hamilton accompanied several officers to the new meeting spot to wait for Jackson, but he failed to appear. The police abandoned the attempted delivery at 5:40 p.m. The officers, with Hamilton, returned to the Shop and advised the employees they could leave the premises. At no point during the May 27 search did the police inform Hamilton or his employees of their constitutional rights under the Fifth Amendment and

*Miranda*. The whole incident, from the time the police approached Hamilton in the parking lot to when the employees were allowed to go home, lasted an hour and a half.

Concurrently with the conversation in Hamilton's office and his assistance with the investigation, the police executed the search warrant on the Shop. The only items seized were the drug-filled parcels. Hamilton testified that the officers never announced to him that they possessed a search warrant. He was not given a copy of the warrant until several days later, when an officer from the Paducah Police Department personally delivered one.

On May 31, 2011, Hamilton met Murphy and another law enforcement official at a governmental office ("Department") to discuss matters relating to the investigation.[1] He went on his own accord and was unaccompanied by an attorney. Though the parties dispute whether the officers read Hamilton his *Miranda* warnings during this meeting, Hamilton voluntarily went to the Department with the goal of aiding in the investigation. He left without incident after an unknown period of time.

In the days after this meeting, law enforcement officers again went to the Shop to ask Hamilton more questions. Hamilton spoke with them voluntarily without an attorney. Though little evidence was offered on the meeting, the parties agree Hamilton was not Mirandized during this particular interaction.

## STANDARD

The Fifth Amendment affirms the right that a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court in *Miranda* recognized that a "suspect under custodial interrogation must be given notice of his Fifth

---

[1] The witnesses did not provide much information about the meeting on May 31. The Court is unsure if Hamilton met the police at the headquarters for the Paducah Police Department or some other governmental office. For simplicity's sake, the Court will refer to this meeting's location as "the Department."

Amendment right against self-incrimination." *United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011) (citing *Miranda*, 384 U.S. at 478-79). *Miranda* does not extend "to on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process." *Miranda*, 384 U.S. at 478.

For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (citation and internal quotation omitted). In deciding whether a suspect is "in custody" for purposes of applying *Miranda*, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). Courts are not beholden to the "subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). "Several factors guide the inquiry: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak,* 552 F.3d 462, 465 (6th Cir. 2009) (citing *United States v. Swanson,* 341 F.3d 524, 529 (6th Cir. 2003)).

A criminal defendant carries the burden to prove by a preponderance of the evidence that he was in custody for the purposes of *Miranda*. *United States v. Smith,* 783 F.2d 648, 650 (6th Cir. 1986); *United States v. Newton*, 284 F. Supp. 2d 868, 873 (S.D. Ohio 2003).

## DISCUSSION

As a precursor to the Court's analysis, there are four undisputed portions of the above-stated narrative that impact this motion. First, the Government concedes that once the officers entered the Shop to execute the search warrant, Hamilton and his employees were not

5

permitted to leave. If Hamilton had decided against cooperating, the officers would not have let him leave until after their search was finished. Murphy explains that the employees were held at the Shop until after the failed delivery so as to prevent anyone from contacting Jackson before the operation was complete. Second, Hamilton says that he voluntarily assisted law enforcement during all three meetings. He has not alleged that officers threatened him, promised favorable treatment, or acted improperly during these encounters. Third, the Government insists that Hamilton was not a suspect in the criminal investigation until well after these meetings. The officers treated him as a cooperating citizen rather than the target of the investigation. Four, neither Hamilton nor his employees who testified at the suppression hearing felt that they were free to vacate the Shop on May 27 until after law enforcement officers permitted them to do so.

Hamilton's principal complaint is the lack of *Miranda* warnings when the police asked him questions about the packages and his relationship with Jackson during the search. With this focus, the Court must determine to what extent individuals detained during the execution of a search warrant are entitled to *Miranda* warnings before the police can solicit information.

In *Michigan v. Summers*, 452 U.S. 692 (1981), the Supreme Court recognized the police's right to detain individuals incident to a search. *Id*. at 705. The authority for a *Summers*-detention is "categorical" and "does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (citation and quotations omitted). On the enigmatic scale of seizures by law enforcement, the Supreme Court classifies a *Summers*-detention below both a "custodial interrogation" and an "arrest." *Summers*, 452 U.S. at 702 (citing *Dunaway v. New York*, 442 U.S. 200, 210 (1979)). It rationalizes this holding in-part because "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information,

6

because the information the officers seek normally will be obtained through the search and not through the detention." *Id*.

Despite this belief by the Supreme Court, lower courts routinely confront circumstances where police effectuating a search overreach in their interrogation of *Summers*-detainees. In these cases, courts must separate the inquiries of whether an individual was properly seized under the Fourth Amendment and whether an individual was due warnings under *Miranda*. *See e.g.*, *United States v. Revels*, 510 F.3d 1269, 1274 (10th Cir. 2007); *United States v. Kim*, 292 F.3d 969, 976 (9th Cir. 2002). Doing so creates fact-laden discussions where, depending on a host of factors, a *Summers*-detainee may or may not deserve *Miranda*'s protections. *Compare United States v. Hernandez-Hernandez*, 327 F.3d 703, 705-06 (8th Cir. 2003) (while defendant was detained during consensual search of home, the statements he made did not arise from a custodial interrogation) *with United States v. Daubmann*, 474 F. Supp. 2d 228, 233-34 (D. Mass. 2007) (*Miranda* warnings were required when IRS agents kept individuals under constant guard, separated from one another, and questioned at length in their sleeping clothes).

Even with the nuances of applying *Miranda* in the context of a *Summers*-detention, the analysis to measure the constitutionality of the police's behavior remains the same. "The key to determining whether an interrogation was custodial, and therefore whether *Miranda* warnings should have been given prior to interrogation is whether 'a reasonable person would believe he is in custody under the circumstances.'" *United States v. Widi*, 686 F. Supp. 2d 107, 112 (D. Me. 2010) (quoting *United States v. Pagan-Santini*, 451 F.3d 258, 263 (1st Cir. 2006)). A court must look to the "totality of the circumstances surrounding the interrogation" to determine questions of custody. *United States v. Adkins*, 169 F. App'x 961, 968 (6th Cir. 2006) (citation omitted). Those courts that have mandated *Miranda* warnings with individuals restrained during a search

7

share certain unifying themes. Placing the target of questioning in handcuffs is recognized as an extreme restraint on freedom and a significant factor for custodial interrogation. *E.g.*, *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (being held in handcuffs is recognized as the hallmark of formal arrest). Where the police brandish their weapons when executing a warrant, individuals detained during the search are often deemed to be in custody for *Miranda* purposes. *E.g.*, *United States v. Peterson*, 506 F. Supp. 2d 21, 24 (D.D.C. 2007) (warnings were required where "unholstered weapons were clearly visible"). Forcefully separating a *Summers*-detainee for questioning during the search also increases the chances of custodial interrogation. *E.g.*, *United States v. Kim*, 292 F.3d 969, 974-76 (9th Cir. 2002) (*Miranda* warnings required where police isolated individual from two family members and questioned her). The nature, duration, and intensity of the interrogation may justify *Miranda* warnings. *E.g.*, *Daubmann*, 474 F. Supp. 2d at 234-35 (interrogation of individuals while "in a humiliating state of undress . . . until agents concluded their questioning" rose to level of custodial interrogation). Finally, overriding the Court's custodial-interrogation analysis is the principle that "a suspect seized as an occupant of a premises subject to a duly issued search warrant is entitled to be free from excessive questioning intended to elicit incriminating information." *United States v. Mittel-Carey*, 456 F. Supp. 2d 296, 304 (D. Mass. 2006) (citation omitted).

  Applying these factors to this case, the Court concludes the police did not take anyone into custody for the purposes of *Miranda* on May 27, 2011. The detention in the Center Room was not a deprivation of freedom sufficient to create a formal arrest. The group was held in a familiar, non-threatening environment. The officers did not take their firearms from their holsters or physically restrain anyone during the encounter. All agree the officers comported themselves in a professional and cordial manner and that the inquiries they made were not excessive. Hamilton

and his employees were not segregated and interrogated by the police, but instead questioned as a group about their identities and the ownership of the parcels. Moreover, officers are permitted to ask individuals detained incident to a search for their identities and information that verifies or dispels criminal conduct without triggering the protections of the Fifth Amendment. *See Mittel-Carey*, 456 F. Supp. 2d at 305 (citations omitted). Thus, the inquiry "who is Mike Moore" did not mutate the interaction between the officers and civilians in the Center Room from a *Summers*-detention to a custodial interrogation.

Nor were the police required to Mirandize Hamilton when they questioned him in his office. Hamilton was in familiar surroundings while he was alone with the officers. The police did not forcibly separate Hamilton from his employees, but asked him to retire to his office for a more private discussion about Jackson. There is no evidence the police leveraged the seclusion to their advantage, as Hamilton and Murphy both testified that what transpired in the office was a courteous and frank discussion about Hamilton's relationship with Jackson. Hamilton was not placed in handcuffs, not the subject of threatening or coercive remarks, and made it apparent that he desired to assist with the investigation. Murphy testified that Hamilton was not a suspect at the time and thus the questions posed to him were not designed to elicit incriminating responses. For this part, Hamilton cooperated voluntarily when the police asked for help contacting Jackson and delivering the narcotics. Viewing the circumstances as a whole, there was no issue of custodial interrogation when Hamilton spoke with and aided the police on May 27.

The same follows for the interviews at the Department on May 31, 2011, and the subsequent meeting at the Shop. With the former, Hamilton went to the Department by himself, answered the officers' inquiries, and left without incident. Both Murphy and Hamilton said that the meeting was non-confrontational and conducted as if Hamilton was a cooperating citizen. He

9

was not restrained or vigorously interrogated by the police. Under these circumstances Hamilton was not in custody. See *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (defendant was not in custody when he went to a police station voluntarily, answered questions, and left the building "without hindrance" after 30 minutes of questioning). For the latter discussion between Hamilton and the police at his Shop, very little evidence was introduced about this conversation at the suppression hearing. No information was provided by either party on the meeting's date, participants, or circumstances. Because it is a criminal defendant's burden to show custody, the Court concludes Hamilton was not due *Miranda* warnings during this interaction with the police. *See United States v. Goldberger*, 837 F. Supp. 447, 452 n. 4 (D.D.C. 1993) (criminal defendants must prove custody by a preponderance of the evidence).

## CONCLUSION

The Court agrees with the Government that Hamilton was not in custody on May 27, 2011, or during his subsequent discussions with law enforcement. Because reasonable people would not have believed the restraint on their freedom under these circumstances was tantamount to a formal arrest, Hamilton's statements did not arise through custodial interrogation. For these reasons, Hamilton was not due notice of his Fifth Amendment protections pursuant to *Miranda*. It hereby ORDERED that the motion to suppress (DN 122) is DENIED.